North Texas Tollway Yes sir, you may come on up. All right, sir, you're up. Good morning, Your Honor. Steve Sanfilippo for appellants. I'd like to address two issues today. The first one being the district court's conclusion that Texas Transportation Code Section 366.178 was not relevant to the determination of whether the imposition of a $25 administrative fee violated appellants' due process rights. And the second issue being the district court's conclusion that imposition of the fee was rationally related to a legitimate government interest. First, with respect to the first claim, the court relied upon three cases from this court to find that the state statute was not relevant to the determination. Well, we don't. I mean, we review the judgment and the decision below. We don't review the, you know, the preciseness of the language and the opinions. And so, I mean, I think you're probably right that to say it's not relevant, that it means nothing, may be an error. But as I read those cases you're about to talk about, it's certainly the case that a violation of state law is not tantamount to a federal constitutional violation. So even if it's something that, let's just assume it can be considered, whether they're, you know, a flagrant violation of state law or something like that, tell us why it gets to a constitutional violation, which is the ultimate decision the district court made. Absolutely, Your Honor. And why we think the statute is important is because the statute puts into perspective that $25 fee maybe that you wouldn't necessarily get if you disregard that statute. Under Section 366.178, that fee was only to be imposed. They were allowed to impose a fee up to, at that time it was $100, in order to recover the cost of collecting unpaid tolls. But the fact that the state statute, which if you're relying on it that heavily to find a federal constitutional violation, if this was only one-fourth of what the cap was under state law, how is that such a violation of what the State intended? It wasn't one-fourth in the sense that they could use any number under $100. That, as the district court found in its first summary judgment order, that fee had to be correlated to the actual cost of recovery. Now, we're not saying it had to be correlated in some kind of mathematical precision based upon each individual case. So what is the actual test we should apply? How close does it have to be? How close it has to be, you know, I hate to get into the sliding scale. That's what you're asking us to do. We're not asking you to do that. What we're asking you to do is to say, I don't know what the number ought to be. I can tell you it's nowhere close to the $25 fee. And our issue before you is whether or not the application of this statute violated our folks' substantive due process rights. And when you look at the amount of the fees that they billed in connection with what their collection costs were, it's not in the realm of being close. Their numbers, their consultant found that it cost them roughly 94 cents. Did that include the cost of my understanding is that was just the marginal cost of, you know, issuing each notice, putting the stamp on it, et cetera. Did that include the cost of installing the cameras, installing the software system? I'm not sure that it included those costs, but those are all costs that had to be incurred when the ZIP cash to collect the regular tolls, right? That's not a fee that had to be incurred with respect to administrative costs because they needed all those things in place. But they needed the camera to get people like your clients who decided they were going to use the toll roads for free. They needed the camera in order to get anybody that used those toll roads that didn't have a toll tag. Well, to send them the bill if they didn't have a toll tag. That's right. My final question, then I'll let you. All right, sure. What case, can you cite us any case finding that a fee or fine of anything of this nature violates substantive due process? I can't tell you that I found a case where they actually found after the merits that a fee did violate substantive due process. I can tell you that this court in the Woodard v. Andrews case, which was an opinion authored by Chief Justice Stewart, at the 12B6 stage found that a claim that a district court imposed fees that were in excess of those allowed by state law stated a viable claim for substantive due process violation. So while we don't have anything on the back end after the merits, we do have. I have a question. Yes. Why is it not, are they not entitled to direct a fee structure to accomplish a goal of trying people to buy a toll tag? In a vacuum, we don't argue that that's not a legitimate government interest. We would know. Who makes that judgment? In other words, in driving that Dallas North toll road, that people have a toll tag facilitates the movement of that traffic quite easily. It facilitates the collection of the responsibilities and so forth. And why shouldn't they direct two different fee structures? They could charge you a lot of money if you don't want to play that game. Suppose that they decide this whole thing is going to be now toll tag. Okay? Is there some substantive due process violation in that? If they wanted to go all toll tag, they certainly wouldn't be with. Right. And that's because they have the power to decide that that's the way they want to run, that they want to collect their fees that way. Right? And so you say that, well, no, if you can ban any other uses of it, if you put too high a price tag on any other alternative means, that is going to violate substantive due process. And I'll tell you another, substantive due process is a very high standard in a wall to climb and is any rational basis for which this state conduct would forward. And I just articulated one that's on its face, I think, rational. In a vacuum, encouraging people to open toll tag accounts is a legitimate government interest. The question is, Ken, is it rational to encourage the use of toll tags by imposing fees that are 26 times your actual cost when the statute limits what you can charge? Why is it perfectly rational if you want very much that they use the toll tag? At some level it's coercion, Your Honor, and as this Court held in the Broussard case, there is a point where an unreasonable fee becomes an impermissibly arbitrary punishment. How is it coercion to allow people to ride a toll road that previous to this system you just, you know, you couldn't ride without paying? I mean, they're trying to open this up to people like your clients who don't have toll tags, and how is that coercion? Who's being coerced to use these roads and not pay for them? It's not being coerced to use the roads, Your Honor. It's being coerced into opening toll tags that people may not want to open. I mean, if that's considered the legitimate government interest, is it rational to bill folks $1.38 billion on 60— Well, after they had a couple chances to pay the toll without any administrative fee, right? They had an opportunity. Certainly an invoice came. There was evidence in the record. Yes or no? Didn't they have multiple opportunities to pay the toll without incurring any administrative fee? There would be an invoice that would arrive, and there would be a late notice, and in the violation stages where the $25 came, there was evidence in the record that some of the folks weren't getting the earlier invoices until the first they would get would be the violation invoice that would have the $25 fee on it. And then they could call and get that reduced. Or if they opened a toll tag, they could get that reduced. Yes, they could call and get it reduced down to $8.33, which is only eight times more than the actual collection cost, which is why I think it's important that we loop the statute in here because it's the statute that authorizes their action, and the statute authorizes them to recover. When did you sue in state court to enforce the state statute? We sued originally in state court, Your Honor, and then it was removed in the federal court, and the court determined that we did not have a private right of action under the statute. Well, that's a pretty good reason. But that really cuts against you. What you're concerned with is an enforcement of what you think is an invalid enforcement of state law. And to recharacterize that as a substitute process, I find it very, very difficult, because the inquiry is whether there's any rational basis for the thing. And you say, well, the fees are excessive. Well, there's a rational basis for charging excessive fees if the object is to encourage or discourage people from using those services for which you're charging more money. And the basic decision is if we're better off running this with people with toll tags, the operation runs better. But if we don't charge more, then we'll never be able to get to a toll-tag society. And even in the forgiveness structure that they set up, it's quite clear that this was the purpose and objective, is that on those fines, if you come back in and get you a toll tag, you can quarrel about how much that was, but it was substantial reduction. But it does signal plainly what the state, what they're trying to do. That is exactly right, Your Honor. And, in fact, I don't know if it's wise policy or unwise policy. I'm just saying to you that you're asking us to say that there's no rational basis for this. But let's keep in mind that the encouraging portion of the statute comes from the fine. There was also a fine of $250 that could be imposed if the fees weren't paid. So what we're looking at here is an administrative fee separate and apart, which is supposed to only go to the cost. They have emergency exits on the side of the toll road, and they use emergency only. And then if you use one, the fine was $1,000. Is that an illegal usage of the property or not? Is that a substantive due process violation because it has nothing to do with cost? It has to do with maintaining the integrity of an emergency exit. Which is a different interest than to recover your costs of collection, which is what this fee was supposed to be. You're saying that the state's interest is in recovering its costs. And I'm suggesting to you that the inquiry is whether there's any rational basis, not just that basis. And one of their interests is, plainly here, is to get to encourage people to use a toll tithe. Now, how do you answer that question? How is that not rational? I answer it by saying, at some level, it still has to be some the fee has to have some rational relationship. You can't impose. So then what stops them from imposing a fee of $100, $1,000, $2,000? Is there no limit? Public pressure. I mean, a lot of things. Besides, the Federal Constitution isn't the only thing at issue here. And it was public pressure that got them to lower it in the first place after they could not justify tying it to the recovery of costs, which is what brings us here. I mean, at the end of the day, this was supposed to be an administrative fee that was used. What should they have done if they were to get people to buy the toll tithe? What should they have done? I mean, they're free to do whatever they want. They can cut deals like they did. They run amnesty programs from time to time that says we'll waive your deals if you open our – I mean, they could put the gates back up there if they wanted, right? Put the gates back up there. And your people would be – then there would be coercion if they decided to use the road. They'd be forced to pay or the gate wouldn't go up and they'd be stuck. But we're not talking about coercion to use the road. We're talking about coercion to use it. They could certainly shut down Zipcash tomorrow, right? But they've chosen to allow folks to operate under the Zipcash system. So is it free for them? Are they free to incentivize folks to open toll tithes? Sure. Are they free to impose a fee that has absolutely no connection to what it's supposed to be connected to? We would argue that – They can close it and incentivize it pretty clearly, but they can't give people – put a high fee on it. I'm sorry, Your Honor. Well, I mean, they can plainly close the access if you don't have a toll tag, period. No question about that. But if they deny access or try to deny access by putting a high charge on that, that becomes a substantive due process violation. That just doesn't make sense to me. Let me tell you a little quick story. In college, I worked at the library, and, you know, people would bring their books and you'd run their card through, and you'd see fines of a few dollars. I checked this student out, and my eyes popped open because the fine was something like $10,000, $20,000. What had happened was she had taken out – you know, they have articles the professors put in the reserve room. Today it's probably all online, but this was back before all that. During exams, I think the fine was something like $25 an hour if you didn't return something in the reserve room because people are all studying for their exams. So she didn't return something during the reserve period. It's accumulating like $25 an hour for months and months. It had nothing to do with the administrative cost of calculating that. It was all we don't want these things kept from other students during exams. Would that be a violation of the Constitution in your theory? Let's assume it was. Let's assume it was. And they are limited to have – and that cost is limited to being reasonable? Yeah, we would say under this court's precedent that that states a viable claim, and we would argue that here. Even though there's a strong interest in keeping students from hoarding the articles, just like there's a strong interest in keeping people using toll tags, which reduces administrative costs, et cetera. And there were other portions of what they could collect that went to that. I see I'm out of time. Thank you. All right. Thank you. You've reserved your rebuttal time. Thank you. Mr. Hastings? How far north does that toll road go now? Almost to Oklahoma, Judge. Seems like it. To the Red River. May it please the Court. I think the Court's questions acknowledge that the plaintiffs face a very difficult burden to try to establish a substantive due process case. We have searched high and low, and we have not found a single case like this where someone was challenging the fee and the courts got into the inner workings and cost accounting of an agency to determine whether it was met substantive due process. The only case they mentioned today is the Woodard case. And, Your Honors, I'd ask the Court to read the Woodard case. It doesn't get into any kind of analysis like this. It was, as the appellant said— Well, I didn't read it. He scared me when he said I wrote it. So when I take a break after this, I'm going to pull it? I'm afraid of him. What am I—I mean, that was 2005. Let's just say I've slept since then. And, Chief Judge Stewart, in the Woodard case there's a very important sentence acknowledging that state law standards do not control the analysis. Good. And as I read Woodard, it's more focused on procedure, and it was at the motion to dismiss phase. We're obviously not even at the motion to dismiss phase here. I was sure you were going to defend the Chief. Your Honor, I would like to put some things in perspective. First, one thing I think that gets overlooked in the debate in the briefs is the starting point for the NTTA's goals is collecting its tolls. And there's a lot of evidence in the record. One site, for example, is 3735. Lots of the presentations to the Board of Directors when the NTTA was evaluating its administrative fee on its own before this litigation started because there were some customer complaints. And number one, they always said our number one goal is to collect the tolls. And as the evidence shows, this is in Steve Turner's declaration, the way this process was handled was successful in collecting a lot of tolls. So waivers were granted, at times complete waivers down to zero. Such was offered to Plaintiff Lewis. They were successful in collecting tolls. That's always been the number one priority for the NTTA. As far as the purposes, I also want to put this case into perspective because the appellant's arguments, they blend everything together, and they don't put this in context. And I know some of your honors are familiar with North Dallas and the way the tollway evolved, but the technology and the innovation over time is very important. In 2000 is when the toll or the administrative rate went from $10 to $25. And in the declaration from Jamie Hoffman, which is undisputed in the record, page 3490, prior to 2000, we didn't have cameras, we didn't have the infrastructure and the computers, the back office staff, to do any type of electronic enforcement. And so the rate was raised because the NTTA was going to a new model that required, and they knew in advance, was going to require additional funds. That model goes into place in 2000. It's not until 2007 when the Zipcash model goes in place. So in 2007, we have another change in the model, which is the change in the model that results in significantly more violations. The model changes. In 2000, the gates are removed. In 2007, they start removing the tollbooths, so it's just like a wide-open highway that you can drive down, improving traffic in Dallas. And so everyone is getting bills either through their toll tag or through this process. A different model that resulted in customer complaints. But it's interesting to put it in perspective. The model's rolled out starting in 2007. It's not completed until 2010. In 2008, and this is on page 3951 of the record, the complaint rate was eight people for every 100,000 contacts for Zipcash. It's not a very big complaint rate. But nevertheless, the NTTA already started looking at cost issues. I probably know five of those white people. And by your honor, by 2009, it went to the whopping rate of 13 per 100,000. As I understand the plaintiff's position, they recognize that there's an interest in converting people to the toll tag. But they're saying that can't be part of the administrative fee, that the administrative fee is limited by statute and even just by its title to administrative slash, you know, collection expenses. What's wrong with that argument, that the nature of this fee prevents you from relying on the interest in encouraging toll tag use? Well, your honor, that's the argument that we believe is bootstrapping the state law statutes or the plaintiff's reading of the state law into the Constitution. The Constitution requires, if we go with the rational basis standard, and I'll come back to that in one second, any conceivable rational basis, even one dreamed up after the fact. Here we have rational bases that include collecting the toll, encouraging toll tag use, recovering costs,  because the appellants mischaracterize how the fine comes into place. But ultimately, there's nothing in the Constitution that tells us which of those policies we're allowed to further or not further. I briefly mentioned I wanted to come back to the standard of review because there's obviously a debate between the parties about what the standard is. Even though you won on rational basis, you're still pushing shocks to conscience? Your honor, we're not prepared to concede that standard, but what I would submit is because we went under rational basis, the court may not need to decide that issue today. If the court were to decide the issue, the appellants, page 18 of their brief, say this is a case of executive and quasi-legislative action. Lewis from the U.S. Supreme Court says shocks to conscience for executive action. This Court's en banc decision in Doe, we believe, stands for shocks to conscience on a quasi-legislative action. Most circuits, I acknowledge we haven't really laid it out clearly, but most circuits that I've seen, the dividing line is if it's a legislative or quasi-legislative action that affects a broad number of people, it's rational basis. If it's an executive action that's directed at a particular individual, a licensing decision, obviously something like Lewis, police action out on the streets, that shocks the conscience. So why do you think this fits within the executive type decision when it affects potentially millions of drivers? Judge Costa, that argument, the plaintiffs also make that argument here, citing the unpublished Gala case, which is, I think, 2001, before this Court's decision in Doe. Doe is important. Although the facts of Doe are horrible and they're unlike the facts of this specific case, the legal principle from Doe is important. There we were dealing, or this Court was dealing en banc with school policies about checking out children. It was the school policies that were at issue applies to a broad number of people when, in fact, the Court even acknowledged that the policy at issue was also a common policy for many other counties, I believe it was in the state of Mississippi. The Court applied shocks to conscience to looking at a policy that was being enacted by school boards. Here we have a policy. But it was all its effect on a particular person, right? I mean, it was how a particular student was treated. Your Honor, the standard, as I understand it, the standard you look at is the standard there was whether the policy itself violated the Constitution. And although it required an injured plaintiff to file the claim, this case requires an injured plaintiff to make the claim. Ultimately, the legal standard is what standard do you use to look at the policy. And a legislative action is very different than an administrative or an executive or a quasi-executive action like what the NTTA would do. We have an organization with a board of directors. It has its own access to its own data. It has its own expertise about how it runs its operations. It's a very different process than when a legislature is debating back and forth with lobbyists about what policy to be enacted. And so we believe that shocks to conscience would be the right standard. But again, it's not necessary to reach because, in this case, rational basis is more than enough to uphold the NTTA's policy. Yes. If it were a rational basis for it, then it might be difficult to say that it shocks your conscience. Absolutely agree, Your Honor. I think they're doctrinally different inquiries. But if you have an action taken directed toward an individual by the state, then that can happen. But that's a product of discrete decision-making, and that's most often where you're going to see substantive process. When you have more group decisions, such as administrative rules, regulations, legislation, then you're into a variation of the equal protection analysis with a substantive due process. And, Your Honor, I agree it's a very different process, which is part of the reason, just stepping back, this is not a proper substantive due process case. As I started with the technology in 2000, Your Honor, we went under either one. For the plaintiffs to prevail, we believe they'd have to prevail under both because the shocks the consciences test does not allow someone to avoid having to show irrationality. Shocks the conscience is higher. So the plaintiffs, we think, have an incredibly different burden. Your Honor, I want to briefly get back to the fine issue. The appellants, one of their arguments today was that it's not appropriate for NTTA to use its administrative fee to provide incentives to take action. I think I heard them concede that it is appropriate to incentivize people to switch to toll tags. But they mentioned the fine and the $250 fine. I want to put that in perspective again because the statute's clear how this works. The fine does not come into place until after someone receives their bill, fails to pay it, receives the next bill with the late charge, the $150 or $250 administrative fee, doesn't pay that, receives the violation invoice with the administrative fees that were at issue in this case, doesn't pay that, then at some point might be turned over to pay a fine. Section 366.178E and G of the statute discuss this. And when a fine comes in place, it's through a court proceeding, and as the statute, you can just see it on the plain language of the statute, the fine goes to the courts. It doesn't even go back to the NTTA to pay their costs and incentives. But when you walk through that process, it's sort of a stepped process. Pay your bill. If you don't pay your bill, you get a late charge. Pay your bill. It's interesting, that late charge, that late invoice tells the recipient, if you don't pay this bill, your next bill is going to be. There's an example of that in the record, 4296. It gives advance notice of the administrative fee that's coming. Then when the administrative fee comes, on the face of the bill, it tells them, the NTTA is willing to reduce this if you pay your tolls and pay this bill on time. So the reduction is disclosed on the face of the invoice. The sample invoice is at 4298. So you have several steps in the process before anyone's ever turned over for a fine, and so for the appellants to suggest that there's some kind of double dipping or that the fine takes care of the deterrence and the encouragement to pay the tolls, I think ignores the entire system. Your Honors, we believe that the district judge ultimately received the right decision, and although there's one sentence in the district court's opinion that we've already heard, that the judge's reference to the state law standards may have been less than precisely written, we think Judge Fish applied the right standard. When you read his analysis, he reached the correct result. He ultimately concluded there is no constitutional violation here. So ultimately, Your Honors, we think this is a clear case where summary judgment was appropriate, and we would ask the court to affirm the district court's decision. All right. Thank you, Mr. Asinx. Back to you, Mr. Sanfilippo, for any rebuttal you have. Just a quick word on the shocks to conscious standard. This court, as Judge Costa pointed out, has held that when the quasi-legislative action affects a large group, it is the rational basis test that applies. That was in the McCaskey case in 2006, and the Gallic case I actually have as being 2011. That was referenced as 2001. I don't have the case here with me. I can't represent that. I didn't write it down wrong, but that's what I had. We would submit that this is a case where the rational basis test clearly applies. I have some questions about how you – if you're right and these fees under the Constitution have to be tied in some way to the cost of collection or the administrative fees, how is the toll road authority or other public entity, when they first start with this process, how are they supposed to figure out what it's going to be? And then if after a year they realize they're wrong, they have to keep every year changing the fees to tie better to what the collection is. It just seems like a very difficult process to work out. We don't argue that that ought to be what happened, but that is not what happened. When they came into existence in 1997, and this testimony is in the record, they just carried over what at that time was a $10 fee that the predecessor entity had charged. When they upped the toll tags in 2000, they upped it to $25, surmising that they would have had an increase in cost because now they're with the toll tags. So now the collection goes, okay, you're three years in. You're going to an entirely new system. You have no data. Okay. We get that. 2007, we go to ZipCash. The $25 fee stays the same. They do an analysis in 2007, which is a year before our relevant time period, and they look at it and realize $25 isn't anywhere close to what it actually cost them to collect an unpaid toll. We would submit that, yes, were we looking at the 2000 time period? You're right. You can't say, hey, these guys, they don't have any data. They still should have known. We are now eight years in. What is the state law that requires that type of cost? It's the language in 366.178, which says that the authority may impose an administrative fee. Read it a little more slowly. I've not read that statute. An authority may charge an administrative fee of not more than $100 to recover the cost of collecting the unpaid toll. As the district court found in its first motion for summary judgment, you cannot reasonably interpret that to mean anything other than it has to be correlated to the collection cost. Otherwise, there's no distinction between the administrative fee and the fine. I think it's arguable. I mean, it could just mean, and this is what the other side argues, that could just be stating the purpose of it. How do you respond to the statutes they cite? I think they're in a footnote, Texas statutes, that more expressly say it has to be tied to the cost of collection. Well, as the district court pointed out, while they could have used even clearer language than this, the court found that given the statutory structure within which this language appears, you can't reach a conclusion. Otherwise, you render superfluous the fine provision because you wouldn't have to have a separate administrative fee. It would all be essentially a fine. So under state law, they simply could not use the higher fee structure as an incentive? A higher fee structure, it's one thing if there was some kind of technical violation. We're talking about before waivers and abandonments, $1.38 billion. Now, you're going to hear a lot and you read a lot in the briefs about how, well, that number's misleading because we waived some of that and we abandoned some of that. But the fact of the matter is there's still $472.5 million in administrative fees that haven't been waived, that haven't been abandoned, that they are attempting to collect ostensibly. I mean, up until the last time discovery was supplemented was the number we have in the record is the $41 million number. But that's not a static final number. And you argue that they shouldn't get the benefit of this leniency that they show in a number of cases because it might be inconsistent. Is there any evidence that any of your clients or any class members were not given the leniency options that some people were? I think one of the plaintiffs is Deborah Gilbert. This is in 4647. She paid the record site, 4647. She paid the entire $125 administrative fee on five unpaid. But did she say she asked and didn't? I mean, of course people were paying the whole fee. But the question is if they called in and said, can we work this out, was anyone saying they denied the opportunity to get a reduction when they tried to work it out? No, I don't know that. I mean, she got the invoice and she paid the invoice. I'm not sure the invoice brought to their attention you've got the option of calling and working this out. It's certainly. No, sure, but your brief indicates that this discretion they're giving is not equally exercised, which is always true of discretion by definition. May I carry on? Just one more point. Okay, so you're imposed $25 fees like Ms. Reyes is for $4,000 worth of bill. And you call in and they negotiate you down to $8.33. Okay, wonderful. They have now cut their overcharge from 25 times what their actual cost is to 8 times their actual cost. And that's really the heart of our argument, Your Honor. It just isn't a rational relationship to their legitimate government interests. All right. All right, thank you, sir. Thank you, Your Honor. Briefing on both sides.